UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| CHRISTOPHER ADAMS, | ) |  |  |
|---|---|---|---|
| Plaintiff, | ) | | |
| v. | ) | No.: | 1:22-CV-125-SKL |
| RANDALL LEWIS, LUKE BURNS, FRANK STRADA, and SHAWN PHILLIPS, | ) | | |
| Defendants. | ) | | |

## MEMORANDUM AND ORDER

Plaintiff Christopher Adams, a prisoner in the custody of the Tennessee Department of Correction ("TDOC") was permitted to proceed in this pro se civil rights action under 42 U.S.C. §1983 on a claim that Defendants Randall Lewis and Luke Burns had him transferred to a different prison in retaliation for exercising his First Amendment rights[1] [*See generally* Docs. 88, 89]. Before the Court are the parties' cross-motions for summary judgment [Docs. 103, 108] and Plaintiff's motion to defer adjudication of Defendants' summary judgment motion and reopen discovery [Doc. 117]. Upon consideration of the parties' pleadings, the summary judgment evidence, and the applicable law, the Court finds that genuine issues of material fact preclude the grant of summary judgment. Thus, the summary judgment motions of both parties and Plaintiff's motion to defer adjudication and reopen discovery will be denied.

**I.     BACKGROUND**

---

[1] Defendants Frank Strada and Shawn Phillips are "sued in [their] official capacit[ies] only for prospective injunctive relief" [Doc. 89 ¶¶ 15, 16].

Plaintiff, an inmate in TDOC custody since 2004, was housed at the Bledsoe County Correctional Complex ("BCCX") continuously from February 4, 2010, to October 4, 2021 [Doc. 104-1 p. 56 ¶ 2; Doc. 109-4 p. 3 ¶ 12]. BCCX is a programming institution that offers various training and programs to reduce inmate's sentences and prepare them for release [Doc. 109-3 p. 2 ¶ 5; Doc. 109-4 p. 2 ¶ 7]. Around the beginning of October 2021, Acting Warden of Treatment ("AWT") Brett Cobble contacted Defendant Unit Manger Randall Lewis and other officials to request a list "of any non-Annex eligible inmates or inmates not currently enrolled in educational, vocational training, or early release programs" [Doc. 109-3 p. 3 ¶ 10]. BCCX commonly transfers inmates who have either finished their programming or have no need of any to make room for inmates with programming needs [Doc. 109-3 p. 2 ¶ 9; Doc. 109-4 p. 2 ¶ 11]. Thereafter, Defendant Lewis discussed the issue with multiple members of correctional staff, including Defendant Sergeant Luke Burns, with whom Lewis shared an office [Doc. 109-8 p. 2 ¶¶ 6-7; Doc. 109-9 p. 2 ¶¶ 5-6; Doc. 125-1 p. 12 ¶ 25]. Defendant Burns asked Lewis to place Plaintiff's name on the transfer list [Doc. 122 p. 6 ¶ 15; Doc. 109-9 p. 2 ¶ 6]. AWT Cobble received the transfer list, which included Plaintiff's name, and Plaintiff's transfer was ultimately approved by BCCX Warden Shawn Phillips [Doc. 109-4 pp. 3-4 ¶¶ 20-23]. So on October 4, 2021, Plaintiff and approximately thirty other prisoners were transferred from the BCCX to the Trousdale Turner Correctional Center ("TTCC") [Doc. 109-4 pp. 3-4 ¶¶ 20-23; Doc. 122 p. 6 ¶ 15; Doc. 124 p. 14 ¶ 31].

Plaintiff contends that Defendants transferred him to a different prison, at least in part, "to retaliate and punish him for exercising" his First Amendment rights [Doc. 89[2] ¶ 85]. Plaintiff

---

[2] Plaintiff's "Verified Amended Complaint[,]" the operative pleading in this case, is not competent summary judgment evidence, as it is not sworn under penalty of perjury. *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (citing 28 U.S.C. § 1746) (holding complaint signed under penalty of perjury carries the same weight as an affidavit for purposes of summary judgment).

points to five separate incidents that "culminat[ed]" to form the basis of his claim [*See* Doc. 105 pp. 9-10; Doc. 109-2 p. 28]. First, Plaintiff filed and won a lawsuit, *Adams v. Baker*, No. 1:16-CV-335 (E.D. Tenn. Aug. 15, 3019) ("*Baker* lawsuit"), against David Baker, his former Tennessee Rehabilitative Initiative in Correction ("TRICOR") supervisor [Doc. 104-1 p. 60 ¶13; Doc. 109-2 pp. 20-21, 22]. Defendant Burns' father had to respond to Plaintiff's public records requests in that lawsuit [Doc. 104-1 p. 60 ¶ 13; Doc. 109-2 pp. 21-22].

Second, Plaintiff and twelve other inmates filed an unsuccessful lawsuit, *Adams v. Parker*, No. 1:19-cv-296 (E.D. Nov. 27, 2019) ("*Parker* lawsuit") regarding TDOC's requirement that inmates wear plastic identification wristbands [Doc. 109-2 pp. 15-17].

Third, Plaintiff had a conversation with Defendant Burns in which he complained that Burns had approved an ineligible inmate's membership in the Lifer's Club, a philanthropic prison organization that Burns sponsored at the time [Doc. 109-2 pp. 8-9, 11, 29-31; Doc. 104-1 pp. 60-61 ¶¶ 14-15]. Plaintiff, the president of the organization, kicked the ineligible inmate out of the club [Doc. 109-2 p. 31]. Plaintiff maintains that Defendant Burns stopped sponsoring the club thereafter due to the "drama" involved [Doc. 109-2 p. 31; Doc. 104-1 p. 61 ¶ 15].

Fourth, Plaintiff advised Inmate Trusty that he could file a grievance about a cell transfer initiated by Defendant Burns [Doc. 109-2 pp. 25-27].[3] Instead of filing a grievance, Inmate Trusty told Defendant Burns about Plaintiff's advice [Doc. 104-1 pp. 61-62 ¶ 16]. According to Plaintiff, Defendant Burns spoke with Plaintiff and told Plaintiff that he "d[id]n't need to be telling people they could file grievances on [Burns]" [Doc. 109-2 p. 27].

---

[3] Plaintiff concedes this instance is not protected conduct but argues that it should be protected "under the umbrella" of Trusty's right-to-access rights [Doc. 125 p. 11].

Fifth, in September 2021, Plaintiff made a verbal grievance to Defendant Lewis concerning his missing commissary, which he believed was stolen by inmate volunteer worker, John Bennett, a friend of Defendants Burns and Lewis who routinely spent time in Defendants' office and ate meals with Defendant Burns [Doc. 104-1 p. 62 ¶ 17; Doc. 109-2 pp. 6-7, 24-25].

Conversely, Defendants deny any retaliatory motive and maintain that Plaintiff's transfer was motivated by three separate, legitimate concerns [*See* Doc. 109-8 p. 3 ¶¶ 12-15; Doc. 109-9 p. 3 ¶¶ 8-10]. One, they state that it was part of a routine population management transfer to make room for inmates arriving at BCCX needing and eligible for programming [Doc. 109-4 p. 2 ¶ 21]. Specifically, Defendants claim that Plaintiff had completed all his required programming at BCCX, that he was not recommended for any other BCCX programs, and that he had not requested to be placed in any education or programming classes [Doc. 109-4 p. 3 ¶¶ 13, 1-17]. Second, they maintain that Plaintiff was a candidate for transfer because he was not eligible to be housed in the annex area of BCCX, which houses "minimum direct or trustee inmates" whose sentences are set to expire within ten[4] years [Doc. 109-3 p. 2 ¶¶ 6-8; Doc. 109-4 pp. 2, 3 ¶¶ 8-10, 19]. And third, Defendants contend that Plaintiff was transferred because of his "lengthy pattern of disrespectful behavior and conduct directed toward institutional staff," "his treatment of other inmates[,]" his "comfort[] disregarding the rules regarding dress attire," the "overall deterioration in his respect toward prison authority[,]" and the fact that his "overfamiliarity with staff" raised "security concerns about [Plaintiff's] proper adherence to proper TDOC policy and facility rules" [Doc. 109-8 pp. 2-3 ¶¶ 8, 10; Doc. 109-9 p. 2 ¶ 6; Doc. 104 p. 51 ¶ 6].

But according to Plaintiff, Defendants found an opportunity to subject Plaintiff to a retaliatory transfer under the guise of an otherwise normal population management transfer when

---

[4] Plaintiff contends that inmates convicted of a sex offense must be within seven years of their release eligibility date to be assigned to the annex [Doc. 124 pp. 2-3 ¶ 5].

4

they were contacted for a list of eligible inmates [Doc. 109-2 pp. 28-29]. In support of this assertion, Plaintiff notes that TDOC policy is to allow inmates to remain at their assigned institutions unless there is a valid reason for transfer, and he states that some inmates have been permanently housed at BCCX for up to forty years [Doc. 122 pp. 9-10 ¶¶ 19, 20, 31, 32]. Additionally, on September 17, 2021, two weeks before his transfer, Plaintiff received his annual reclassification hearing, where it was determined that Plaintiff would remain a minimum-security inmate at BCCX and continue participation in the TRICOR Prison Industry Enhancement Certification Program ("PIE") [Doc. 104 p. 24 ¶¶ 3, 4]. Sergeant Burns was a member of classification panel and did not recommend Plaintiff to be transferred at that time [Doc. 104-1 p. 5 ¶¶ 4, 5]. Plaintiff also challenges the assertion that he had completed his programming and had not requested any additional classes, stating that at the time of his transfer he was a participant in the TRICOR PIE and the Take One programs, he was on the register to take the Cognitive Behavioral Intervention Program ("CBIP"), and he begun the enrollment process for Chattanooga State Community College's sponsored associate degree program [Doc. 104 p. 26 ¶ 13; Doc. 125-1 p. 2-3 ¶¶ 5-7].

As to the contention that Plaintiff's transfer was prompted by the need to occupy the facility with annex-eligible inmates, Plaintiff notes that the annex area of BCCX is a separate compound from where he was housed, and thus, his transfer did not impact the space available for annex-eligible inmates [Doc. 125-1 pp. 7-8 ¶ 17; *see also* Doc. 109-4 p. 4 ¶ 22]. Plaintiff also points out that, as to his purported conduct, he has no disciplinary convictions and no contact notes indicating he has engaged in any improper conduct, such as "defiance," "dress code violation," "solicitation of staff," or "violation of TDOC/institutional policies" [Doc. 104-1 p. 5 ¶ 7; Doc. 104-2 pp. 44-46, 53-55, 63, 67-69, 99-102, 105-08]. He further buttresses his claim of retaliatory motivation

5

with the declarations of Inmates Bruce Tuck and James Roysdon, who aver that Sergeant Burns admitted to them on separate occasions that he submitted Plaintiff's name for transfer because of the *Baker* lawsuit and the negative effect that lawsuit had on Burns' father [Doc. 104-1 pp. 37, 41].

Plaintiff asserts that because of his transfer to TTCC, he lost his lucrative TRICOR job assignment; approximately $10,000 worth of leather craft supplies; "reasonable" law library access; a much safer prison environment; and liberal faith, recreational, and higher education opportunities [Doc. 122 pp. 7-8 ¶¶ 21-26; Doc. 125-1 ¶ 16; Doc. 104-1 pp. 43-44, 46-48, 50-51, 53-54, 57-59 ¶¶ 4-9, 62-63 ¶ 18].

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322. Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial. *Id.* at 323. That is, to successfully oppose a motion for summary judgment, "the non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010).

At summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But "[w]hen opposing parties tell two different stories, one of which is blatantly

6

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "The blatantly contradictory standard is a difficult one to meet and requires opposing evidence that is largely irrefutable[.]" *Amerson v. Waterford Twp.*, 562 F. App'x 484, 489 (6th Cir. 2014); *see also Jones v. Garcia*, 345 F. App'x 987, 990 (6th Cir. 2009) (observing that if the non-moving party's version of events "does not require such a suspension of reality that no reasonable juror could accept it . . . that is enough to allow a jury to hear the claim"). Objective evidence, such as video footage, can satisfy this standard. *See Scott*, 550 U.S. at 380-81 (finding that unambiguous video footage blatantly contradicted the plaintiff's account). However, evidence that is not objective, such as "deposition testimony, affidavits, and prison records" generally does not. *Oliver v. Greene*, 613 F. App'x 455, 458 (6th Cir. 2015).

Once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . [the ultimate decision becomes] . . . a pure question of law." *Scott*, 550 U.S. at 381 n.8 (emphasis in original). But if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 889 (1990)).

## III. ANAYLSIS

Retaliation against a prisoner for exercising his constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). To establish a First Amendment retaliation claim, a plaintiff must prove that (1) he engaged in protected conduct; (2)

7

the defendant took an adverse action against him "that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) the adverse action was at least partially motivated because of the protected conduct. *Id*. Plaintiff "has burden of proof on all 3 elements." *Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003). If a plaintiff can make this showing, then the burden shifts to the defendant to "show that he would have taken the same action in the absence of the protected activity[.]" *Thaddeus-X*, 175 F.3d at 399.

Plaintiff argues that he is entitled to summary judgment because he satisfies all three elements of a prima facie case of retaliation [Doc. 103]. Defendants contend that they are entitled to summary judgment because Plaintiff's conduct is mostly unprotected, a prison transfer is not a sufficiently adverse action, and there is no evidence to suggest that Plaintiff's conduct motivated any action taken by Defendants [Doc. 109].

A. **Protected Conduct**

Plaintiff maintains he engaged in protected conduct when he filed the *Baker* lawsuit; filed the *Parker* lawsuit; gave advice to an inmate regarding his grievance opportunities; complained to Defendant Lewis regarding his stolen commissary; and confronted Defendant Burns regarding another inmate's membership in the Lifer's Club. The parties agree that Plaintiff engaged in protected conduct when he filed the *Baker* and *Parker* lawsuits [*See, e.g.,* Doc. 129 p. 8]. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977) (holding it "established beyond doubt that prisoners have a constitutional right of access to the courts"), *overruled in part on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996).

However, the parties disagree whether Plaintiff's verbal complaints and conversations constitute protected conduct [*Compare* Doc. 105 *with* Doc. 109]. It is well settled that a prisoner has a right to file non-frivolous grievances "on his own behalf." *Herron v. Harrison*, 203 F.3d

8

410, 415 (6th Cir. 2000). But a prisoner must exercise this right in accordance with "the legitimate penological objectives of the corrections system" for the conduct to be protected. *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001); *see also Thaddeus-X*, 175 F.3d at 395 (holding prisoner violating "legitimate prison regulation" is not engaged in protected conduct). Defendants have presented evidence that TDOC implemented a formal inmate grievance procedure that defines a "grievance" as a "written complaint" about a "condition or incident" that "personally affects the inmate complainant" [Doc. 109-4 p. 2 ¶ 5; Doc. 109-5 p. 2; Doc. 109-6 p. 2; Doc. 109-8 p. 2 ¶ 4; Doc. 109-9 p. 2 ¶ 4; Doc. 124 p. 3 ¶¶ 6-7]. They maintain that Plaintiff did not engage in any protected conduct by merely holding conversations with officers [Doc. 121 p. 4-5]. And while Defendants concede that oral grievances may constitute protected conduct under some circumstances, they argue that this right is limited to the threat to file a non-frivolous grievance, *see Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009), and the filing of oral grievances at an institution with an informal grievance policy, *Maben v. Thalen*, 887 F.3d 252, 265-66 (6th Cir. 2018), neither of which are applicable in Plaintiff's case [Doc. 109 p. 10]. Plaintiff, meanwhile, argues that essentially any expression of complaint satisfies a dictionary definition of "grievance" and constitutes protected conduct [Doc. 124 p. 3 ¶¶ 6, 7].

The Court declines to adopt either Defendants' narrow view or Plaintiff's expansive one. Instead, verbal grievances that would be protected if memorialized in writing constitute protected conduct. *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010) ("Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." (quoting *Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) ("We decline to hold that legitimate complaints lose their protected status simply because they are spoken."))); *Maben*, 887 F.3d at 265 (holding "prison officials [are not] allowed to

9

retaliate against [an inmate] for making an oral grievance"). Thus, the Court asks whether Plaintiff's verbal complaints or interactions were made as "part of his attempt to access" redress for his grievance. *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005); *Maben*, 887 F.3d at 264-65. If so, that conduct is protected under the First Amendment.

First, Plaintiff alleges that he engaged in protected conduct when he advised Inmate Trusty that Trusty could file a grievance concerning a cell transfer conducted by Defendant Burns [Doc. 109-2 p. 25-27].[5] But any right Plaintiff had to assist Inmate Trusty is limited to assistance necessary to vindicate Trusty's right of access to legal redress. *See, e.g., Thaddeus-X*, 175 F.3d at 395. And there is no evidence that Inmate Trusty would have been unable to file a grievance or pursue legal redress absent Plaintiff's assistance. *See Cromer v. Dominguez*, 103 F. App'x 570, 573 (6th Cir. 2004) (finding the inmate plaintiff did not engage in protected conduct by representing inmates in presenting grievances where the plaintiff did not show that the inmates receiving the assistance would otherwise be unable to pursue legal redress (citing *Herron*, 203 F.3d at 415)). Therefore, Plaintiff did not engage in protected conduct within the meaning of the First Amendment when he advised Inmate Trusty regarding his grievance rights.

Second, Plaintiff maintains that he engaged in protected conduct when he complained to Defendant Burns, sponsor of the Lifer's Club, that he permitted an ineligible inmate to place membership in the organization [Doc. 105 p. 10]. Plaintiff argues that he "had an interest as president of the Lifer's Club to ensure that it operated within the parameters of department policy and their bylaws" [*Id.*]. But his verbal complaint to Defendant Burns was not lodged to remedy anything that affected Plaintiff's own rights. *See Herron*, 203 F.3d at 415. And, in fact, Plaintiff's

---

[5] Plaintiff never submitted a verbal or written grievance over the matter [Doc. 109-2 p. 32].

conversation with Defendant Burns was not an attempt to petition for redress, as Plaintiff had the authority to unilaterally remove the ineligible inmate from the roster and did so [Doc. 109-2 p. 31]. Therefore, Plaintiff's verbal complaint regarding the Lifer's Club does not constitute protected conduct.

Third, Plaintiff contends he engaged in protected conduct when he complained to Defendant Lewis in September 2021 that his commissary was stolen, ostensibly by volunteer worker John Bennett [Doc. 104 p. 7; Doc. 109-2 pp. 23-25; Doc. 124 pp. 22-23 ¶¶ 53-54]. This verbal complaint was made on Plaintiff's own behalf, *Herron*, 203 F.3d at 415, and it was a conversation Plaintiff initiated to seek relief about a prison issue, *Maben*, 887 F.3d at 265 [*See* Doc. 109-2 p. 24]. Therefore, the Court finds Plaintiff engaged in protected conduct when he made a verbal complaint to Defendant Lewis concerning his commissary.

### B. Adverse Action

The second element of a retaliation claim is whether "an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that [protected] conduct[.]" *Thaddeus-X*, 175 F.3d at 394. Defendants argue that prison transfers that do not involve a change in security level (like Plaintiff's) are "ordinary incidents of prison life" that do not give rise to a retaliation claim absent Defendants' knowledge of "foreseeable, negative consequences" that "inextricably followed" as a result of the transfer [Doc. 109 pp. 13-14, citing *Jones v. Caruso*, 421 F. App'x 550, 553 (6th Cir. 2011) (citations and internal quotation marks omitted)].

"Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a person of ordinary firmness from continuing to engage in protected conduct." *Siggers-El*, 412 F.3d at 701. Defendants contend that the consequences suffered by Plaintiff as a result of his transfer, such as the loss of his job,

11

educational opportunities, etc., are not adverse under the First Amendment, as Plaintiff has no vested constitutional interest in such things [Doc. 109 pp. 14-17]. But "[t]he lack of entitlement to a particular privilege does not free prison administrators to grant or withhold the privilege for impermissible reasons." *Newsom v. Norris*, 888 F.2d 371, 377 (6th Cir. 1989); *see also Brown v. Johnson*, No. 2:10-CV-965, 2012 WL 3237198, at *3 (S.D. Ohio Aug. 7, 2012) ("The law with respect to retaliation simply does not require that every act taken by a prison official in retaliation for an inmate's exercise of his constitutional rights be an independent constitutional violation. If that were the case, the retaliation claim would always be superfluous, because the inmate could simply proceed on the underlying constitutional violation."). Moreover, because "there is no justification for harassing people for exercising their constitutional rights," the deterrent effect "need not be great to be actionable." *Thaddeus-X*, 175 F.3d at 398 (citation omitted); *see also Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994) ("[R]etaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment.") (citation omitted).

Here, Plaintiff has presented evidence that that his transfer led to a number of foreseeable consequences, such as the loss of property; loss of a high-wage job; loss of participation in rehabilitative, vocational, and educational programs; loss of more lenient access to recreation and the law library; and transfer to an institution housing more violent, higher-classification inmates [Doc. 104-1 pp. 39, 43-44, 46-48, 50-51, 53-54, 57-59 ¶¶ 4-9, 62-63 ¶ 18; Doc. 122 pp. 7-8 ¶¶ 21-26; Doc. 125-1 ¶ 16]. Such consequences could constitute an adverse action. *See, e.g., Hill*, 630 F.3d at 474 (finding transfer to facility with more restrictions and fewer privileges constituted adverse action); *Siggers-El*, 412 F.3d at 701-02 (finding transfer adverse where it caused prisoner loss of high-paying job); *Bell v. Johnson*, 308 F.3d 594, 604 (6th Cir. 2002) (finding confiscation of property and legal papers sufficient to support the adverse action element of retaliation claim);

*Clark v. Johnston*, 413 F. App'x 804, 815 (6th Cir. 2011) (finding "deprivation of personal . . . property can be considered an adverse action"); *Reynolds v. Green*, 25 F. App'x 256, 261 (6th Cir. 2001) (finding adverse action where prisoner was transferred from facility where he could "come and go with permission" to one where he could not). And because a reasonable jury could find (or decline to find) the consequences suffered by Plaintiff would be sufficient to deter a person of ordinary firmness from continuing to pursue lawsuits or lodge complaints regarding his prison conditions, summary judgment is not warranted as to the second element of Plaintiff's retaliation claim. *See Bell*, 308 F.3d at 603 (finding that "unless the claimed retaliatory action is truly inconsequential, the plaintiff's claim should go to the jury") (citation and internal quotation marks omitted).

### C. Causal Connection

The third element of a retaliation claim–causation– is typically a factual issue. *Maben*, 887 F.3d at 267. It considers whether the defendants' subjective motivation for the adverse action was, at least partially, to retaliate against the plaintiff for engaging in protected conduct. *Hill*, 630 F.3d at 475. The causation inquiry requires a plaintiff to show both: (1) "that the adverse action was proximately caused by an individual defendant's acts" and (2) "the individual taking those acts was motivated in substantial part by a desire to punish an individual for exercise of a constitutional right[.]" *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (citations and internal quotation marks omitted). This standard "includes liability for acts giving rise to the ultimate harm, even if the harm is executed by someone else." *Id*. (citation omitted). Because of the difficulty in proving an individual's motive, circumstantial evidence, such as "the disparate treatment of similarly situated individuals or the temporal proximity between the [plaintiff's] protected conduct and the official's adverse action" may be sufficient to "create an inference of retaliatory motive." *Hill*,

13

Case 1:22-cv-00125-SKL   Document 132   Filed 04/09/24   Page 13 of 17   PageID #: 2479

630 F.3d at 475-76 (citations omitted). If a plaintiff can make this showing, the defendants then has the burden of showing that they would have taken the same action even absent the protected conduct. *Thaddeus-X*, 175 F.3d at 399.

Defendants argue that there is no evidence to suggest that Plaintiff's conduct motivated Defendants' actions, and the temporal proximity between the lawsuits and Defendants' conduct is too tenuous to impose liability [*See* Doc. 109 pp. 17-18, 22; Doc. 129 pp. 5-7]. They note, for example, that the evidence establishes that Plaintiff never filed a grievance about his missing commissary or discussed it with Defendant Burns [Doc. 109-2 p. 24]; the *Parker* lawsuit was dismissed almost two years before Plaintiff's transfer, and Defendants were not parties in that suit [Doc. 109-2 pp. 16-17; Doc. 109-8 p. 4 ¶17; Doc. 109-9 p. 3 ¶12; Doc. 124 p. 17 ¶ 40]; and the *Baker* lawsuit took place in 2015, judgment issued in 2019, and Defendants were not parties or personally involved in that suit [Doc. 109-2 pp. 20-21; Doc. 109-8 p. 3 ¶ 16; Doc. 109-9 p. 3 ¶ 11; Doc. 124 p. 15 ¶ 37]. Defendants otherwise argue that they have demonstrated that Plaintiff would have been transferred even in the absence of any protected activity by Plaintiff, as the evidence makes it clear that Plaintiff was transferred as part of a standard procedure based on the legitimate needs of the prison [Doc. 109 p. 23; *see also* Doc. 109-4 p. 3 ¶¶ 12-19].

But Plaintiff has presented declarations from Bruce Tuck and James Roysdon, both of whom maintain that Defendant Burns stated on separate occasions that Plaintiff was transferred because of the effect the *Baker* lawsuit had on Burns' father [Doc. 104-1 p. 37, 41]. Specifically, Bruce Tuck maintains that Defendant Burns "state[d] that he had [Plaintiff] moved in a bragging manner[,]" and that although he "advised Lewis that he wanted [Plaintiff] placed on the list because he had become 'too comfortable with staff, calling staff members by their first names and demanding that things be done on behalf of the Lifer's Club, but the real reason was due to the

14

lawsuit that [Plaintiff] filed against TRICOR,' because Burn[]s' father was working for TRICOR at the time that the lawsuit was filed" [Doc. 104-1 p. 37 ¶ 2]. James Roysdon avers that he was present in Defendants' office when Defendant Burns told Defendant Lewis to place Plaintiff's name on the transfer list, and that Defendant Burns stated that the "reason for it" was "to get a little pay-back" "because of a lawsuit that [Plaintiff] had filed on TRICOR" that caused Burns' "father [to] pace the floors worrying" [Doc. 104-1 p. 41 ¶¶ 3-4]. Defendant Burns denies this allegation but admits that Inmate Roysdon was present in Defendants' office when the decision was made to add Plaintiff to the transfer list [Doc. 104 pp. 91-92 ¶¶ 5, 7; Doc. 109-9 p. 3 ¶ 11].

Defendants urge the Court to find these inmate declarations regarding Defendant Burns' alleged statements impermissible hearsay [Doc. 129 pp. 6-7]. A court cannot consider inadmissible hearsay when ruling on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). But these statements are not hearsay, because they are "offered against a party and [are] 'the party's own statement in either an individual or representative capacity.'" *Jewell v. CSX Transp. Inc.*, 135 F.3d 361, 365 (6th Cir. 1988) (quoting Fed. R. Evid. 801(d)(2)(A)). Instead, the Court finds these statements are "key piece[s] of evidence relating to causation[.]" *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (finding court should have considered inmate affidavit recounting alleged overheard conversation between corrections officers).

And Plaintiff's claim that his transfer was retaliatory is supported with other circumstantial evidence to counter Defendants' evidence. First, Plaintiff avers that the BCCX compound where he was housed is separate from the BCCX annex, such that his transfer would not make beds available at BCCX's annex [Doc. 125-1 pp. 7-8 ¶ 17]. Next, as to the claim that Plaintiff was transferred because of a lengthy pattern of disrespectful behavior and conduct, his comfort

15

disregarding rules regarding attire, an overall deterioration in his respect toward prison authority, and for failure to follow TDOC policies [*see* Doc. 104 p. 51 ¶ 6], there is no evidence of such conduct in the record. Rather, on September 17, 2021, approximately two weeks prior to Plaintiff's transfer, at Plaintiff's annual reclassification hearing, a classification panel that included Defendant Burns determined that Plaintiff would remain minimum custody at BCCX and continue working in the TRICOR program [*See* Doc. 104 p. 24 ¶ 3; Doc. 104-2 pp. 53-56; Doc. 104-1 p. 5 ¶ 4]. Defendant Burns did not express any concerns regarding Plaintiff's conduct, dress, or attitude at that time [Doc. 104-1 p. 5 ¶ 5].

Further, Defendant Lewis' contention that Plaintiff was transferred for a "lengthy pattern disrespectful behavior and conduct directed toward institutional staff" in 2021 [Doc. 109-8 p. 3 ¶ 10] is a stark contrast to the clemency recommendation he wrote for Plaintiff in 2020 asserting that Plaintiff "has always been helpful and respectful to [Defendant Lewis] and other staff" [Doc. 104-2 p. 95]. And Plaintiff has presented evidence that he has no disciplinary history or negative contact notes at all, much less for the allegedly disruptive behaviors cited by Defendants [Doc. 104-1 p. 5 ¶ 7; Doc. 104-2 pp. 63-108]. To contrast Defendants' assertions regarding Plaintiff's behavior/conduct, Plaintiff has produced evidence of his significant rehabilitative efforts while incarcerated, which include that he has earned two college degrees and two vocational certifications, completed numerous programs and classes, and served approximately eleven years on the board of the Lifer's Club [Doc. 122 p. 19 ¶ 61; Doc. 125-2].

Accordingly, under the evidence presented, a rational jury could ultimately conclude that Plaintiff's protected conduct motivated Defendants' decision to transfer him. And the same jury could conclude that Plaintiff's protected conduct did not motivate Defendants, or that they would have transferred him anyway. The Court concludes it is a jury's call to make.

## IV. CONCLUSION

As set forth above, there are genuine disputes of material fact as to Plaintiff's retaliatory transfer claim that preclude resolving this case on summary judgment. Therefore, the summary judgment motions of both parties [Docs. 103 and 108] are **DENIED**. Thus, this case will proceed to trial on Plaintiff's retaliatory transfer claim against (1) Defendants Randall Lewis and Luke Burns solely in their individual capacities and (2) Defendants Frank Strada and Shawn Phillips solely in their respective official capacities and only for any prospective injunctive relief that may ultimately be ordered [*See* Doc. 89 ¶¶ 15-16].

Considering this Order, Plaintiff's motion to defer adjudication of Defendant's motion for summary judgment and reopen discovery [Doc. 117] is also **DENIED**. *See* Fed. R. Civ. P. 56(d)(1)-(3).

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE